[Filed December 20, 1888.]

## N. LANGELL, Appellant, v. A. LANGELL, Respondent.

PARTNERSHIP — SUIT TO DISSOLVE — PRIOR PARTNERSHIP — EVIDENCE OF — ITS EFFECT. — In a suit by a partner to compel a copartner to account for partnership profits received by him, and the partnership has been of long standing, and was formed by written articles, the plaintiff will not be permitted to claim that prior to its formation another partnership had existed between the parties, and that the defendant retained the profits realized therefrom, and included them in the part of the capital stock which the articles of the subsequent partnership specified that he had invested therein, where said articles are silent as to any prior partnership, and as to any profit having been realized therefrom.

ARTICLES OF COPARTNERSHIP — CONTEMPORANEOUS PAROL AGREEMENT. — Where N. L. and A. L., on the twenty-seventh day of February, 1869, entered into written articles of copartnership which specified that they had respectively invested certain amounts: held, that it was not competent for N. L. to prove a contemporaneous parol agreement between them, to the effect that the parties were to put into the copartnership the stock

and profits of an alleged previous copartnership transaction, and that it constituted a part of the amount invested by A. L. And where the alleged previous partnership transaction of a government contract, taken in the name of J. L., the father of N. L. and A. L., who, long prior to the commencement of the suit, had died, and there was no memorandum or any date whatever showing what profits were realized therefrom beyond a mere conjecture, a court of equity will not attempt to take an account thereof.

PARTNER—DUTY TO ACCOUNT TO COPARTNER.—It is the duty of a partner to account to his copartner for all funds arising from the sale of partnership property, which come into his hands. And where the partner, instead of paying over to the copartner his share of such funds, invests them in other property, the latter is entitled to claim a share of the property proportionate to his interest in the partnership. But where partnership transactions are various and multiplied, and have been of long standing, and no account has been kept of them by which it can be ascertained in what property the funds have been invested, or to what extent investments thereof have been made, courts will not attempt to trace the complainant's share of the funds into other property, but adjust the matter upon the basis of the amount of funds received by the delinquent partner.

TRUST—A TRUST MUST BE PLEADED IN ORDER TO BE AVAILABLE.—In order to unite a claim to recover back an estate, or to have a trust therein declared, with a claim for an accounting, it must be pleaded as a separate cause of suit. Nor will the plaintiff be entitled to such character of relief where he has conveyed the estate by voluntary deed, unless it was procured to be made by fraud, or unless subsequent circumstances of such a nature have arisen as would render the retention of the property by the grantee unconscionable and fraudulent.

PLEADING—SUFFICIENCY OF.—Where the plaintiff alleged in his complaint that, for the purpose of enabling the defendant to sell certain described lands, in which he (plaintiff) had an undivided half-interest, he gave the defendant a deed to his interest therein, and for no other purpose or consideration: *held*, that the allegation was not sufficient to entitle him to a reconveyance; that his remedy in such a case would be upon the obligation of the defendant to sell the land and account for the proceeds; and that a promise to do so, and a refusal to comply therewith, would be material allegations in order to establish the liability.

APPEAL from the Circuit Court for the county of Jackson.

*H. K. Hanna,* for Appellant.

*C. W. Kahler, E. B. Williams,* and *John Burnett,* for Respondent.

THAYER, C. J. — This appeal is from a decree in a suit brought by the appellant against the respondent, for an accounting as a copartner.

The appellant alleged in his complaint, that in 1867 he and the respondent entered into a partnership for the purpose of stock-raising, and such other business as might be connected with dealing in cattle; and that they had, since that time, carried on and conducted such business; that in 1867 the appellant obtained for the partnership a contract to furnish a large amount of beef to the government at Fort Klamath; that the partnership filled such contract, and realized a large profit therefrom, — the exact amount of which was unknown to appellant, — and that the respondent retained the whole thereof; that subsequently the partnership bought a large band of cattle and drove them out to Klamath County, where, by agreement, they were left in charge of respondent; that appellant contributed to the purchase of the cattle a large sum of his individual money; that in 1872 and 1873 appellant obtained for the partnership two other contracts with the government to furnish beef to the Indians at the Yainax reservation on Sprague River; that the partnership filled said contracts and realized large profits therefrom, all of which were retained by respondent; that said cattle increased in numbers, and the respondent each and every year sold a part thereof, and received large sums of money therefor, — the amounts of which were unknown to appellant, — all of which he retained, except the sum of fifteen hundred dollars paid for swamp-land purchased by the partnership; that in 1880, the respondent sold the greater portion of the partnership cattle, and realized therefrom the sum of $8,234.50, all of which he retained; that the respondent from time to time, against the wishes of appellant, expended large sums of the partnership funds in buying and improving real estate, taking the title thereto

in his own name; that during said time the father of appellant and respondent died seised of a large body of land, situated in said county of Klamath, leaving them his only heirs at law; that appellant afterwards, for the purpose of enabling the respondent to sell said land, and for no other purpose or consideration, gave respondent a deed to it all; that respondent had since purchased a large band of horses and a quantity of valuable farming implements with the partnership funds, and refused to render any account thereof, or to pay appellant any portion of the same.

The respondent denied the partnership, denied any contract of partnership to furnish beef in 1867, or of the furnishing of any beef, or of the realizing of any profits, or of the retaining the amount realized from the contract, or that the partnership had any interest in it, and denied all the other material allegations in the complaint.

The respondent for a further answer alleged that on February 27, 1869, he and appellant entered into an agreement for a general partnership for five years; that each partner was to put into the business certain property, and that in contemplation of said partnership respondent, in the spring of 1869, purchased about one hundred and ninety head of stock,—cattle,—and took them to Langell Valley, and kept them there until the succeeding fall; that appellant failed and expressly declined to put into the partnership the property which he had agreed to, and voluntarily and with respondent's consent withdrew from it; that in the fall of 1869 respondent sold a portion of the cattle for twelve hundred dollars, and on the thirteenth day of December of that year he and the appellant had a full and final settlement; and that in consideration of one thousand dollars, which he then and there paid appellant, the latter sold and transferred to respondent all his interest in the remainder of said cattle, and that said part-

nership agreement was then and there abandoned and annulled; and that no partnership had existed, nor any partnership business been done, since December 13, 1869.

The appellant, in reply to the new matter in the answer, denied all the material allegations thereof, except the length of duration of the partnership.

The case was heard in the circuit court upon depositions of witnesses and written proof, and a decree was entered therein dismissing the complaint, from which decree this appeal was taken.

It appears from the evidence in the case that the parties are brothers; that on the twenty-seventh day of February, 1869, they entered into the following agreement in writing under seal:—

## "ARTICLES OF COPARTNERSHIP.

"Articles of agreement made and entered between N. Langell, of the one part, and Arthur Langell, of the other part, witnesseth as follows:—

"The said N. Langell and Arthur Langell have joined and by these presents do join themselves to be copartners together in all business in which they may be engaged in; and that the said partnership shall be known by the name of N. Langell and Brother; and said copartnership to continue for five years, unless per agreement it shall be sooner dissolved.          "N. LANGELL.          [SEAL]
                           "ARTHUR LANGELL.   [SEAL]

   "Witness:—
      "LOUIS SOLOMON.
      "N. FISHER."

Also, on the same date, entered into the further agreement as follows:—

"N. Langell and Brother has this day, February 27, 1869, entered into copartnership, and have invested the following amounts in said partnership: N. Langell has placed

in said partnership $1,725.75.   This amount includes his residence adjoining P. P. Prim's residence on the northeast; also his town property fronting on California Street and joining David Lunn's brick building on the south.   Arthur Langell has invested $3,000 in said partnership.

" N. LANGELL.

"ARTHUR LANGELL."

It further appears that about the time of the execution of these agreements Arthur Langell engaged in buying up cattle, and that about the 1st of April, 1869, he had secured a band of one hundred and sixty head; that N. Langell assisted him in obtaining funds for that purpose; that the said parties then, in conjunction with one Isaac Woolen, who put with the band about sixty head of his own cattle, started with them for some point east of the Cascade Mountains in Klamath County, for the purposes of establishing a cattle ranch.

Mr. Woolen testified in regard to the matter as follows: "About the 1st of April, 1868, or 1869,— I cannot remember the exact date,— I had, prior to that time, made a contract with plaintiff and defendant to put in some cattle with their band, to drive with them to some place east of the Cascade Mountains, Lake County, at that time.   At that time Arthur Langell, the defendant, had a claim at Linkville, which claim is now owned by Quincy Brooks, as I understand.   In pursuance of that arrangement, at the time above mentioned, they brought, that is, the plaintiff and defendant, about two hundred head of cattle to my place above mentioned, and staid at my house all night with the cattle.   Plaintiff and defendant were both there with the cattle.   I put into the band next morning about sixty head of cattle.   Plaintiff and defendant and myself started next day with their cattle and mine to drive out to the Lake country."

XVII. OR.—15

The witness, after describing their journey, which lasted many days, which also included a description of their various camping-places until they arrived at a creek called Yainax, which runs into Sprague River, testified: "That night we were visited by quite a number of Indians. They objected to our stopping there with the cattle, because we were on the reservation. We told them we were going about five miles farther, up to the springs. They claimed that the springs were also on the reservation. The question then arose what we had better do. Arthur Langell, the defendant, was in favor of going on. Nat Langell, the plaintiff, said 'all he had was in the cattle, and that he did not propose to take any chances.' I was in favor of going back, too. I did not want to take any chances. Plaintiff and myself being in the majority, we overruled Arthur, and we started back with the cattle, and drove back over the mountains, and let them stop on Alkali Lake, while we camped on Lost River, where the plaintiff and defendant and myself talked the matter over, and the next day, with our consent, Arthur Langell, the defendant, went up Lost River to look for a range for the cattle. I went with Arthur, and Nat Langell, the plaintiff, was left in charge of the cattle. We were gone two days. During our absence we found a proper place for the cattle, and we gathered up the cattle and took them up to the place selected by us. We all remained there about a week, fixing corrals and getting out material for other purposes."

In another part of his testimony, the witness stated: "I understood from plaintiff, Nat Langell, and the defendant, Arthur Langell, that they owned the cattle in partnership. I heard them both repeatedly so state; I also heard their father make the same statement in their presence. I heard Arthur Langell say several times that he and Nat Langell, the plaintiff, were full partners in the

cattle.   Heard Arthur Langell say so at the time we were
driving the cattle out where we left them, and heard him
say so several times afterwards up to the time I sold my
cattle, which was about one year and a half afterwards."

This witness resided at Seattle, Washington Territory,
at the time he gave his testimony, and it was taken there,
under a commission issued out of the said circuit court.
I refer to it particularly for the reason that the witness
had a good opportunity to know the business relations
existing between the parties, and he appears to be wholly
indifferent in the matter.

A large amount of other testimony, bearing upon the
question of copartnership between the parties that was
taken, including the testimony of the parties themselves,
was of the same character as that given by Mr. Woolen,
but it does not have near the same weight.   He had
opportunities of knowing the fact, which none of the other
witnesses, aside from the parties themselves, possessed;
and but little reliance can be placed upon the testimony
of the parties for the reason that it is conflicting.

I think, therefore, we must conclude that the parties,
at least in the outset, were partners in the cattle.   The
written articles, it is true, do not specify in what business
they intended to become partners, but provide that they
join themselves to be copartners together in all business
in which they may be engaged.   This evidently refers to
business engaged in by them jointly, whatever kind it
might be; and their immediately engaging in the cattle
business together would indicate the kind of business
which the partnership was formed to carry on.

Counsel for the appellant claims that the parties were
partners in the contract to supply beef to the government
at Fort Klamath; that the appellant caused the bid there-
for to be made in his father's name; and that it was left
to his father nominally for the benefit of the appellant

and respondent; that the respondent received the profits arising out of the contract and used them in the purchase of the cattle bought for the partnership, under the articles of February 27, 1869, and that they constituted the whole or a part of the three thousand dollars which the respondent invested in said partnership, as provided by said articles.

If we were to judge the matter from the situation of the respective parties, and the circumstances surrounding it, we should be inclined to believe that the appellant was an actor in that affair. The financial condition of the respondent at the time, the dependent condition of the father, and the position occupied by the appellant, together with the evidence regarding the transaction, furnished cogent proof that the latter secured the contract, and that it was fulfilled in the manner claimed by him. But if this were so, what *data* is there by which an accounting can now be enforced? The transaction occurred in 1867, there is no proof showing that any profits were realized from it; the father is dead, and the brother denies the appellant's right absolutely, and he has failed to preserve any memorandum by which they can be ascertained.

In his testimony in the case, he testified, in answer to the question as to whether he ever had any settlement with his brother or father, or had received anything from either of them, that he had not; that at the time the articles of partnership were drawn up, his brother had no books or accounts of the contract with him, and that they, — "we agreed to put the whole thing, whatever it might be, in the cattle we was about to buy. That is all I know about it."

In the same connection, however, he testified that he drew up the articles of agreement as his brother wished them, and inserted the amount of money he could put in himself; that his brother said he could raise three thou-

sand dollars, and that he, appellant, inserted that amount in the articles of agreement. Here was an agreement deliberately made between the parties and signed by them, establishing relations of copartnership, and a very important affair existing between them, according to the claim of the appellant, left out, and now sought to be established by parol proof.

If the parties had agreed to put the proceeds of the beef contract into the cattle they were about to buy, as the appellant seeks now to establish after the lapse of many years, why was it not included in the writing? Courts cannot be expected to adjust matters between parties where they have dealt so loosely and carelessly with each other. As far as we are able to judge, the business relations between the parties commenced with the execution of the written articles referred to, and we must regard those articles as fixing the extent of their liability to each other.

The respondent, in denying the copartnership between him and the appellant, under the articles of February 27, 1869, attempted to sustain his denial upon two grounds: 1. That he never went into partnership with appellant, that the papers were drawn up to go into partnership when the appellant converted his house and town property into money, and furnished the same, together with $225.75 which he then had on hand, to buy cattle; and that there was no partnership until the money was furnished, and that he had failed to furnish it; and in the fall of 1869 wrote the respondent a letter notifying him that he declined going into partnership; 2. That appellant, in consideration of one thousand dollars, sold all his right and interest in the cattle, and gave respondent a bill of sale of the same, dated Jacksonville, December 13, 1869.

In view of the first ground, the respondent in his testimony denied that the cattle were bought for the partner-

ship, unless, as he stated it, the papers were complied with; denied that after the cattle were purchased and being removed to now Klamath County that he recognized his brother as a partner in them; stated that he had no recollection of telling Woolen anything about the cattle, only that they were his,—"my cattle." And when inquired of how his brother came to go out with the cattle, whether as a hired man, made the following answer: "He just volunteered to go out with me and help me out with the cattle." This ground of denial cannot be sustained by the evidence in the case, and circumstances attending the affair, and the respondent evidently was compelled to abandon it before he finished giving his testimony, as will be seen by his answer to the following cross-interrogatory put to him when on the stand, as a witness in his own behalf: —

"You may state whether or not, when you were taking the cattle out in 1869, and while you were out there, you told Mr. Woolen that you and Nat owned the cattle together or were partners in the cattle. Answer. I can't recollect positive; I think we talked it over. My understanding at the time of going out with the cattle, and some time afterwards, was, that we were partners in the cattle."

Besides, the papers contained no such conditions, as intimated by respondent, to be complied with.

The second ground is more tenable. The respondent produced a writing signed by the appellant, purporting to be a sale of his interest in the cattle; and he claims that it was executed upon a settlement between the parties of the appellant's interest in them. The respondent testified upon the subject as follows:—

"I received a letter from him [appellant] along in the latter part of the summer or fall. In the letter he notified me that he had not sold his property, that he had put

in those articles drawn by him, that he declined going into partnership. He wrote that he had a good home, and could make a living in his shop at his business. Should he sell out, and put it into cattle, he might lose them all by a hard winter, or the Indians might break out and get away with them all. He wanted me to come in, as he had borrowed some money from Mr. Beekman for me to buy cattle at Sterling, and wanted it settled up. I sold some cattle late in the fall, I think it was in December, 1869; I then came into Jacksonville and settled up with him.

"Question. Well, when you came in after selling those cattle, state what transpired between you and Nat in reference to the business. Answer. We settled up, took down the amount that was owing. As near as I can recollect, $450 was due Mr. Beekman, $220.75 was due my brother, and there was one or two other bills, I think, for hire of the horse that he rode out with the cattle, and his work going out helping me. I then paid him one thousand dollars, for which he sold all his right and interest in the band of cattle and two horses, which was all I had, and he gave me a bill of sale of the same.

"Question. Is this the bill of sale that he gave you at the time? Answer. Yes, sir; that is it."

The following is a copy of the pretended bill of sale:—

[REV. STAMP.]          "JACKSONVILLE, Dec. 13, 1869.

"For and in consideration of the sum of one thousand dollars to me in hand paid, and this is the receipt of the same, I have this day sold all my right and interest in a certain band of cattle ranging at the head of Lost River, in the county of Jackson, state of Oregon, to Arthur Langell and Joseph Langell, who has said cattle in their possession.

"Dec. 13, 1869.          N. LANGELL." [SEAL]

The appellant testified, in answer to a question as to whether in the latter part of the summer or fore part of the fall of 1869 he wrote respondent that he had not sold his property put into the articles of copartnership, and that he declined going into the partnership, that he never wrote him any letter of that kind. He further testified thereto as follows: "I wrote him a letter. I think it was late in the fall of 1869. In that letter I told him I feared I was going to get into trouble about an article or articles which I had published; I think it was in the Oregonian; and as I did not wish to annoy him in the business we were then engaged in, I then offered to sell him my interest in the cattle. My offer was, that I would take a thousand dollars for my interest, over and above all indebtedness of the firm, including the note I owed Beekman, and keep my property here; that is to say, I was to come out of the business with a thousand dollars in cash. That was the contents of my letter to him."

The appellant, after stating to the effect that he received in reply to that letter one from the respondent, which had accidentally been burned up, testified regarding the contents of the letter to him from the respondent as follows: "He wrote me he would accept my terms if he had the money; that he had sold but few cattle that fall, owing to the fact that they were not fat; that after paying expenses and the debts, that he would have but little left. He then told me that if I thought myself in danger of getting into trouble, for me to send him a bill of sale, and that would protect him, at least out there."

In answer to a question asked the appellant as a witness on the stand, as to whether or not, in writing a second letter to the respondent, he inclosed with the letter a bill of sale of the cattle, he answered: "Yes, sir, I did. After I received his letter in relation to the bill of sale, I thought the matter over, and concluded to do so, the bill of sale

being only to be used as a protection to him in case of trouble. I concluded to insert my father's name as well as my brother's. I had implicit confidence in my brother at that time, and I knew that my father would not take any advantage of me in that respect. In a short time after,—say four or five weeks after I sent this bill of sale, —this trouble which I anticipated had blowed over. I then wrote to my brother that the trouble had passed over, and for him to burn that bill of sale. The next time he came in he told me that the bill of sale was burned or destroyed."

The appellant also testified that the bill of sale introduced by his brother and filed as evidence was the same bill of sale, and that he never received the consideration mentioned therein, or any part of it, for his interest in the cattle. Here is a direct conflict between the statements of the parties as to an occurrence within the personal knowledge of each of them, and the court has no way of determining it except by determining which of the statements, in view of all the evidence and circumstances in the case, is the more probable.

The respondent has the bill of sale which the appellant confesses to have signed, and in the absence of certain features it exhibits, which will be hereafter referred to, I should regard it as decisive of the contention in the respondent's favor.

In a controversy of the character of the one involved in this case arising out of transactions of long standing, writings relating to them, executed by the parties or acted upon by them, are usually about the only proof that is reliable. In disputes between parties in regard to matters which involve pecuniary interests, their respective statements concerning the matters are so liable to conflict that it is very difficult, if not impossible, to ascertain the truth;

and in the endeavor to arrive at it in such cases courts and juries must carefully weigh all the circumstances.

According to the testimony of the respondent, he received a letter from the appellant, notifying him that he, appellant, had not sold his property that he had put into the partnership, and that he declined going into it, giving his reasons therefor, and requesting respondent to come in, as he had borrowed some money from Mr. Beekman for respondent to buy cattle at Sterling, and he wanted it settled up; that he sold some cattle, went to Jacksonville, and settled up with appellant; that they took down the amount due Mr. Beekman, $450, the amount due appellant, the $220.75 he had advanced for respondent, one or two other bills, he thought for the hire of the horse that appellant rode out with the cattle, and appellant's work in going out and helping respondent on that occasion. The whole affair, according to respondent's testimony, only consisted in the appellant's exercising his option not to go into the partnership, and the payment to him by the respondent of the amount of liabilities the latter had incurred, and for his work in assisting respondent in driving the cattle out to the range. The appellant claimed no interest in the cattle, nor did the respondent concede that he had any. Yet, the latter says: " I then paid him, appellant, one thousand dollars, for which he sold all his right and interest in the band of cattle and two horses, which was all I had, and he gave me a bill of sale of the same."

It is unnecessary to add that the respondent's account of the affair, as testified to by him, involves a marked incongruity. There is also another phase of it tending to render it absurd. The bill of sale, as may be seen by referring to it, was not to Arthur Langell, but to Arthur Langell and Joseph Langell, the father. Now, in view of the respondent's testimony, what explanation can be

offered for inserting or allowing to be inserted Joseph
Langell's name in the bill of sale as a joint purchaser of
the cattle? The circumstance is wholly inconsistent with
the testimony of the respondent, and entirely consistent
with that of the appellant regarding the affair. Besides,
a large number of witnesses in the case testify to acts
done and declarations made by the parties long after the
date of the alleged bill of sale, tending to show that they
still continued to be partners in the cattle as before. I
do not see how, in the light of the evidence, the conclusion
that the·parties were partners in the cattle can be avoided.
The respondent, it is true, had the main conduct of the
business. The appellant was not present assisting in its
immediate operations; the proof shows that he was only
on the ground a few times; but it discloses that he always
took a lively and active interest in the affair. He bought
and shipped supplies to the respondent, procured loans of
money used in the business, and it is evident that he was
mainly instrumental in obtaining the contracts with the
government to furnish beef to the Indians at the Yainax
reservation in 1872 and 1873, which we may infer from
the evidence were profitable. There seems, however, not
to have been any account of the partnership transactions
kept by the parties or either of them, nor acts done by
them which would constitute the basis for an accounting.
The cattle seem to have been kept together in a band
long after the period of duration of the copartnership, as
provided in the articles, had expired. It is alleged in the
complaint that the respondent in 1880 sold the greater
part of them, and realized the sum of $8,234.50 therefor,
all of which was retained by him. This allegation is not
denied in the answer, except by denial of the sale of part-
nership cattle, and a realization of said sum therefor, or
any sum. The denial, as I view it, merely denies the
partnership.

The appellant also alleged in his complaint that the respondent from time to time, against his wishes, expended large sums of the partnership funds in buying and improving real estate; taking the title thereto in his own name; and that he had since purchased a large band of horses, and a lot of valuable farming implements, with said partnership funds; and that he refused to render any account of the partnership funds or property, or pay appellant any portion thereof.

It is the duty of the respondent to account for this partnership property, and the appellant is entitled to claim a one-half interest in the net funds arising therefrom. He is also entitled to claim his share in any property in which the respondent is shown to have invested said funds. We think, however, that as the transactions have been of so long standing, and no account having been kept of them, it would be futile now to attempt to trace the appellant's share of the funds into other property, or to ascertain with mathematical accuracy the amount he is justly entitled to; his negligence in that respect has lost to him rights which he might otherwise have been enabled to enforce. He has an excuse for his laxity in the particulars referred to, on account of the relationship existing between him and the respondent; but that can only serve as a paliative to himself; it will not answer the behests of the law, which exacts vigilance and promptness as much in such a case as in any other. The respondent, no doubt, sold more or less of the cattle out of the band every year, and may have invested a part of the proceeds therefrom in the lands he now possesses; but at the same time he paid the expenses of the business, and fifteen hundred dollars for the appellant's share of the swamp-land, which the latter had the benefit of; besides, he gave his entire time and attention to the business, and endured all the hardships and privations which

it imposed.   I think, therefore, that the proceeds of the sale of the cattle in 1880, the $8,234.50, should be regarded as the only assets of the partnership in which the appellant has an interest, aside from the real property specified in the said articles; and that the $3,000 acknowledged in the articles to have been put into the concern by the respondent, and the $220.75 cash put in by the appellant, should be deducted therefrom, and the appellant be entitled to one half the remainder, and the said $220.75, aggregating $2,727.62½, with interest thereon from the first day of January, 1881, at the rate of eight per cent per annum, and that the said property of the appellant should be relieved from any claim or charge on account of the copartnership.

The claim of the appellant to recover back the interest in his father's estate, which he conveyed to the respondent, or to have a trust declared in his favor in the premises conveyed, could not be considered in the suit herein, without being pleaded as a separate cause of suit.   Nor am I able, in fact, to discover how the appellant can be entitled to any relief on account of that transaction.   The deed was voluntarily made, and unless the appellant can establish fraud in its inception, or by matters *ex post facto*, he is not entitled to any such relief.   Where a deed is executed to effectuate a particular purpose, which, in consequence of the happening of some unforeseen event, cannot be consummated, and the grantee notwithstanding insists upon retaining the property conveyed, it would be an unconscionable and fraudulent act upon his part, and a court of equity would doubtless compel a reconveyance to the grantor.   But a conveyance to a grantee to sell the land would stand upon a different footing.   There the remedy of the grantor in case of the refusal to make the sale would be upon the obligation, which would be a promise to sell the property and account for the proceeds.

And whether or not it could be enforced in a court of equity may be doubted. At all events, the party would not be entitled to relief without alleging the promise and refusal, neither of which the appellant alleged in this case.

We are of the opinion that the appellant is entitled to a decree herein, for the sum of $2,727.62½, with interest from the first day of January, 1881, at the rate of eight per cent per annum; that his said property mentioned in said articles be relieved from any claim or charge on account of the copartnership, and that neither party be entitled to costs; but that each be required to pay one half of the fees of the clerk of this court upon the appeal.